Timothy J. Dance (11553)
Alan L. Sullivan (3152), *of counsel*
Snell & Wilmer L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
Email: tdance@swlaw.com
          asullivan@swlaw.com

*Attorneys for Plaintiff Privacy-Assured Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PRIVACY-ASSURED INC., a Canadian Corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>ACCESSDATA CORPORATION LIMITED, a Corporation organized under the laws of England and Wales, ACCESSDATA GROUP, INC., a Delaware Corporation, TIMOTHY LEEHEALY, an individual, SIMON WHITBURN, an individual, and JOHN DOES 1-10<br><br>        Defendants. | **PLAINTIFF'S REPLY TO DEFENDANT ACCESSDATA GROUP, INC.'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>Case No. 2:16-cv-00275-CW<br><br>Judge Clark Waddoups |

Plaintiff Privacy-Assured Inc. ("**Privacy-Assured**") respectfully submits this reply to AccessData Group, Inc.'s Opposition to Motion for Partial Summary Judgment, dated September 9, 2019.

**SUMMARY**

**Undisputed facts**—There are no disputed issues of fact material to Privacy-Assured's motion for partial summary judgment. As shown below, the factual assertions advanced by

4820-2504-1319.1

AccessData Group, Inc. ("**AD Group**") are based on (1) the testimony of Timothy Leehealey, who conceded under oath that he has no knowledge or memory of the relevant agreements and events, and (2) AD Group's attempt to discredit admissions made by its own Rule 30(b)(6) witness, whose testimony is binding on AD Group under the rule.  AD Group's "additional undisputed facts" at pages 8 to 10 of the Opposition are, for the most part, immaterial in the present context.  To the extent they bear on the present motion, Privacy-Assured addresses them at the end of the "Facts" section of this memorandum.

**Scope of the Shared Services Agreement**—AD Group's principal argument is that its Shared Services Agreement with AD Corp did not cover AD Corp's distribution of AD Group's products through Privacy-Assured.  There is nothing in the Shared Services Agreement itself to support this argument.  To the contrary, as shown in Part I of the Argument below, both AD Group and AD Corp consistently treated the distribution of AD Group software products in Canada—including Privacy-Assured's distribution rights—as part of the work AD Corp was obligated to perform under the Shared Services Agreement.  AD Group's Associate General Counsel testified that he signed the Privacy-Assured Distribution Agreement on behalf of AD Corp under authority of the Shared Services Agreement.  AD Group's Rule 30(b)(6) witness confirmed this observation.  And elsewhere in the Opposition, AD Group itself states that Privacy-Assured's Canadian distribution rights were, in fact, covered by the Shared Services Agreement.  (See next paragraph.)  In short, this argument should be rejected because it is unsupported by the Shared Services Agreement, and it is belied by the parties' conduct, accounting records, and sworn testimony.

**AD Corp's alleged default**—AD Group's next argument is that AD Corp defaulted on the Shared Services Agreement by failing to abide by the terms of its distribution agreement with Privacy-Assured.  It is worth a mention in passing that this argument is factually and legally inconsistent with AD Group's first argument.  As shown in Part II of the Argument below, the

4820-2504-1319.1

most obvious response to this second argument is that it is foreclosed by the Rule 30(b)(6) testimony of AD Group's representative, who testified that after review of all relevant records he was not aware of any default of the Shared Services Agreement committed by AD Corp. Beyond that, nothing in the Shared Services Agreement required AD Corp to retain Privacy-Assured to distribute software. If it did retain Privacy-Assured and then later decided to ignore Privacy-Assured's rights, there is no reason why that should be considered a violation of the Shared Services Agreement. Most importantly, it is undisputed that AD Corp did not independently decide to withhold AD Group's products from Privacy-Assured. Rather, it was forced to violate its agreement with Privacy-Assured when AD Group, the manufacturer and owner of the software products, refused to allow AD Corp to distribute them through Privacy-Assured.

**AD Corp's entitlement to payment**—AD Group's third argument is that, according to Timothy Leehealey, AD Corp was not entitled to any payment from AD Group under the Shared Services Agreement. As shown in Part III of the Argument below, the problem with this argument is Mr. Leehealey himself. He testified under oath that he knew nothing about the obligations or rights of the parties under the Shared Services Agreement. Even though he signed it on behalf of AD Corp, he did not recognize it when it was shown to him. He disclaimed any knowledge or information that would enable him to say whether Ad Corp was or was not entitled to payment. Beyond that, all of AD Group's and AD Corp's accounting records demonstrate unequivocally that AD Corp is entitled to the payment of millions of dollars from AD Group under the Shared Services Agreement.

**Alleged resolution of AD Group's liability to AD Corp**—Finally, AD Group argues that by the time Privacy-Assured executed on the AD Corp Collateral in late 2015, the collateral had ceased to exist because all inter-company obligations under the Shared Services Agreement had already been "resolved." According to AD Group, the AD Corp Collateral "disappeared" when AD Group began the process of terminating AD Corp's existence in August 2015. As

shown in Part IV of the Argument below, however, the unrebutted testimony of AD Group's Rule 30(b)(6) witness (who is also its Chief Financial Officer), is to the contrary.  As of the winding up of AD Corp's affairs, there was still a massive receivable from AD Group on AD Corp's books;  the receivable included this Court's judgment confirming the Privacy-Assured arbitration award.  There was a corresponding payable on AD Group's books.  According to AD Group's Rule 30(b)(6) witness, AD Group's attempt to reduce the inter-company payable to zero through an accounting trick was "mere sloppiness."

## UNDISPUTED FACTS

AD Group's responses to Privacy-Assured's Statement of Undisputed Facts fall into three categories.

The first category consists of denials based on Mr. Leehealey's deposition testimony. He was the Chief Executive Officer and a director of both AD Group and AD Corp at all relevant times. In response to Privacy-Assured's Fact 3 and Fact 10, AD Group states the conclusion that AD Corp was not entitled to payment from AD Group under the Shared Services Agreement and that AD Corp defaulted on its obligations under that Agreement. These conclusions are based entirely on the deposition testimony of Mr. Leehealey.  It is clear from other portions of Mr. Leehealey's deposition, however, that his opinions on matters relating to the Shared Services Agreement are entitled to no weight.   As shown in the next paragraph, they lack foundation.

Mr. Leehealey testified that even though he signed the Shared Services Agreement on behalf of AD Corp, he could remember absolutely nothing about it, other than that it was a cost-plus five percent contract. *Deposition of Timothy Leehealey* (March 19, 2019) at 103-04.  (The relevant portions of this transcript are annexed hereto as Exhibit 1.)  He could not identify the Shared Services Agreement when it was shown to him. *Id.* 103.  He recalled none of its terms, and he was unwilling to say that looking at the agreement during his deposition refreshed his

recollection. *Id*. 104-05.  He testified that he did not know what the responsibilities of the parties under the agreement were, nor did he know any of the requirements imposed by the agreement. *Id*. 105.  He did not know, for example, whether AD Group was to reimburse AD Corp for its expenses and costs.  *Id*. 105-06.  Mr. Leehealey testified that he did not "recall the relationship sufficiently" to answer any questions about the Shared Services Agreement. *Id*. 108.  Under these circumstances, it is a mystery how this witness would have a basis to opine on anything relating to the agreement.[1]

The second and most important category of allegedly disputed facts concerns the testimony of Jonathan Cook, the Chief Financial Officer of both AD Group and AD Corp.  AD Group designated Mr. Cook as its Rule 30(b)(6) witness on all matters relating to the Shared Services Agreement.  In its Opposition, AD Group argues that Mr. Cook's testimony on its behalf should be ignored.  Thus, in response to Privacy-Assured's Fact 10, AD Group argues that the Court should disregard Mr. Cook's testimony that he was unaware of any default of the Shared Services Agreement by AD Corp.  AD Group argues that this testimony is "immaterial." Likewise, in response to Facts 11, 14, 15, and 16, AD Group argues that the Court should ignore Mr. Cook's testimony because he rendered only "lay opinions" on AD Group's accounting records.

These arguments should be rejected for two obvious reasons.  In the first place, Mr. Cook is an accountant and is the CFO of AD Group.  Designated as the person most knowledgeable under the Rule 30(b)(6), he specifically reviewed all relevant accounting records to prepare for his deposition. *Deposition of Jonathan Cook,* Vol. II (March 20, 2019) at 108, 127, 132, & 154. (Relevant portions of this transcript are annexed as Exhibit 2.)  In the second place, since Mr. Cook was designated as AD Group's Rule 30(b)(6) witness, AD Group is bound by his

---

[1] It is also important for the Court to know that AD Corp designated Mr. Leehealey as that company's Rule 30(b)(6) witness on matters relating to the Shared Services Agreement, among other topics.  Without notice or excuse, however, Mr. Leehealey failed to appear at the Rule 30(b)(6) deposition scheduled for him. His failure to appear is the subject of an ongoing discovery dispute.

4820-2504-1319.1

admissions under the rule.  *See e.g., Vehicle Market Research, Inc. v. Mitchell International, Inc.*, 839 F.3d 1251, 1259–60 (10th Cir. 2016) (a corporation generally cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative in the summary judgment context.)[2]

The third category of AD Group's factual argument appears in its response to Privacy-Assured's Fact 2.  AD Group does not explicitly disagree with the statement that AD Corp promised in the Shared Services Agreement to provide technical and sales support for the distribution of AD Group's software.  Rather, AD Group argues that the Shared Services Agreement was limited geographically (to "the United Kingdom and surrounding regions"), presumably to suggest that the agreement had nothing to do with Privacy Assured or its distribution of products in Canada.  The problem with this argument is that it is belied by the sworn testimony of AD Group's witnesses, its accounting records, and its statements elsewhere in the AD Group Opposition.  Thus, AD Group's associate general counsel, William Fountain, testified that he signed the Privacy-Assured Distribution Agreement under authority of the Shared Services Agreement.  *Deposition of William Fountain* (July 12, 2019) at 46.  (Relevant portions of this transcript are annexed as Exhibit 3.)  Likewise, AD Group's Rule 30(b)(6) witness testified that AD Corp entered into the Privacy-Assured agreement "based on [its] responsibilities under the Shared Services Agreement."  *Deposition of Jonathan Cook*, Volume I (Feb. 1, 2019) at 37.  (Relevant portions of this transcript are annexed as Exhibit 4.)  And from 2011 forward, AD Group consistently accounted for its Canadian sales and the expenses relating to them (including the Privacy-Assured arbitration award) as payables to AD Corp under the Shared Services Agreement.  Finally on this score, it is important to point out that AD Group's arguments elsewhere in the Opposition are based on the fact that the Shared Services Agreement

---

[2] Moore's Federal Practice states: "[C]ourts have ruled that because a Rule 30(b)(6) designee testifies on behalf of the entity, the entity is not allowed to defeat a motion for summary judgment based on an affidavit that conflicts with its Rule 30(b)(6) deposition or contains information that the Rule 30(b)(6) deponent professed not to know." § 30.25

covered all Canadian sales.  Specifically, the predicate of AD Corp's argument at pages 15 and 16 of its Opposition—asserting that AD Corp violated the Shared Services Agreement by violating Privacy-Assured's rights—is that Canadian sales through Privacy-Assured were covered by the Shared Services Agreement.

At pages 8 to 10 of the Opposition, AD Group sets forth eleven "additional undisputed facts," all of which all relate to the grounds of the Arbitration Award (July 29, 2014) against AD Corp.  The apparent point of this factual presentation is to establish a basis for the argument that AD Group should be absolved of liability to AD Corp because of the latter's failure to comply with the Privacy-Assured Distributor Agreement.  We deal with that argument in Part II of the Argument, below.  For the most part, AD Group's recitation of "additional undisputed facts" is accurate, but they are immaterial in the present context.  The only "additional undisputed material facts" that require a response are the following:

**Additional Fact 5.** Thereafter, AD Corp. refused to provide AD Group products and software license renewals for AD Group products, to Privacy-Assured for resell through its distributors in Canada. *J. McGuire Written Testimony* at ¶ 13, Exhibit 8, hereto; *B. Roemelle Written Testimony*, ¶ 11, Exhibit 9, hereto.

**RESPONSE**: Disputed.  Under the Shared Serviced Agreement, all decisions relating to the "distribution and provision of product and software licenses" were to be made at the sole discretion of AD Group.  AD Group, rather than its wholly-owned subsidiary AD Corp,  decided it was not going to distribute to Privacy-Assured.  *See Response to Interrogatory No. 4 in AD Group's Response to Privacy-Assured's Second Set of Discovery*, annexed as Exhibit 5.

**Additional Fact 6.** Additionally, AD Corp. refused to ship AD Group products and software to customers who had purchased products through Privacy-Assured or honor any such orders. *See B. Roemelle Written Testimony*, ¶ 24, Exhibit 9, hereto.

**RESPONSE**: Disputed.  See response, above, to Additional Fact 5.

**Additional Fact 8**. As the result of the breach, the Arbitration Tribunal awarded Privacy damages in the amount of $2,559,000. *See, generally, Final Award of the Tribunal*, Exhibit 11, hereto.

**RESPONSE**: Disputed in part. The arbitrator determined that AD Corp owed Privacy-Assured $2,589,351, plus interest, costs, and attorney fees.  This Court's amended judgment, which confirmed the award, brought the total to $2,821,139.

**Additional Fact 9**. AD Corp. did not perform its obligations under the *Shared Services Agreement*. *See Leehealey Dep.* at 109:15-17, Exhibit 1, hereto.

**RESPONSE**: Disputed.  See response, above, to Additional Fact 5.  Mr. Cook admitted on behalf of AD Group that AD Corp never defaulted on its obligations under the Shared Services Agreement.  *Cook Dep*. Vol II, at 105, annexed as Exhibit 2.

**Additional Fact 10**. AD Corp. is not entitled to payment under the *Shared Services Agreement. See id.,* at 106:20-23, 107:13-22.

**RESPONSE**: Disputed.  Based on his review of the financials for both companies, Mr. Cook admitted that AD Group never paid AD Corp the five percent premium to which AD Corp was entitled under the Shared Services Agreement.  His testimony was as follows:

> Q.   So as you sit here today, has AccessData Group paid AccessData Corporation, Limited, the 5 percent under the Shared Services Agreement during the course of the agreement?
>
> **A.  No, because by the time they determined -- I'm not sure why.  Sloppiness. But, like I said, those should have been settled on an annual basis, if we're following best practice. Again, I'm not -- that's what I've done in the past. Those were never settled before the unwinding [of AD Group] occurred.**
>
> Q.   And you saw no evidence that they were settled after the -- during the course of the unwinding and after the unwinding?
>
> **A.  No.**

*Cook Dep.* Vol. 2 at 95, annexed as Exhibit 2.  Asked whether the five percent premium was ever paid to AD Corp during the winding up process for AD Corp, Mr. Cook answered, "No."  When

asked whether payment should have been made, Mr. Cook answered, "Yes." *Id.* at 99.  Mr.

Cook testified that at the time of AD Group's unwinding in 2015, "those [i.e., the payments for

the five percent premium owing under the Shared Services Agreement] should have been settled

through a cash transfer, but I never saw that happen." *Id.* at 98-100.

**Additional Fact 11**. AD Group did not breach the *Shared Services Agreement*. *See* Response

to Interrogatory No. 1, Exhibit 5, hereto.

**RESPONSE**: Disputed.  See response to Additional Fact 9 and Additional Fact 10,

above.

## ADDITIONAL UNDISPUTED FACTS

The additional facts listed below, all of which are undisputed, relate to AD Group's

argument that AD Corp violated the Shared Services Agreement by failing to sell products to

Privacy-Assured.

1.      Interrogatory No. 4 of Plaintiff's Second Set of Interrogatories to AD Group

("Discovery Responses") asked AD Group to "[i]dentify all services performed by ADG under

the Shared Services Agreement."   AD Group answered:

> ADG Performed all service necessary to allow ACL to perform its services to
> ADG under the Shared Services Agreement. Those services include legal; record
> and book keeping; payment services; money transfers; drafting; sales fulfillment;
> processing and support; distribution and provision of product and software
> licenses; document review; edit and signing; contract negotiation; product
> training; litigation assistance; and general operations . . ..

(AD Group's interrogatory answers are annexed as Exhibit 5.)

2.      Interrogatory No. 5 of Plaintiff's Second Set of Interrogatories to AD Group,

asked AD Group to "[i]dentify all amounts received from sales of any ADG products in Canada

4820-2504-1319.1

from the time of the Distributor Agreement through termination of the Distributor Agreement."

AD Group answered:

> To the extent ADG possess information responsive to this Interrogatory as the
> result of service it provided to ACL under the Shared Services Agreement, the
> answer may be determined by examining, auditing, compiling, abstracting, or
> summarizing ADG's business records which have been produces or will be
> produced herewith….

     3.      Interrogatory No. 6 of Plaintiffs Second Set of Interrogatories to AD Group asked

AD Group to "[i]dentify all agreements maintained or serviced under the Shared Services

Agreement by ADG."  AD Group answered: "ADG serviced (as defined herein) each and every

agreement of [AD Corp] with a third party . . . . "

     4.      The Arbitration Award held that the owner of the AccessData software breached

the Distributor Agreement by "selling directly its Summation Products (and renewals thereof)

into Canada after execution of the exclusive Agreement and by unilaterally attempting to change

the financial terms and conditions of the Agreement."  *See Final Award of the Tribunal* (July 29,

2014) at 6, annexed as Exhibit 6.

## ARGUMENT

### I.    The Shared Services Agreement Covered AD Corp.'s Distribution of AD Group's Products Through Privacy-Assured.

AD Group incorrectly argues that its Shared Services Agreement with AD Corp did not

cover AD Corp's distribution of AD Group's products through Privacy-Assured.  There is

nothing in the Shared Services Agreement that supports this.  And the argument has been

controverted by AD Group's own admissions.  Both AD Group and AD Corp consistently

treated the distribution of AD Group software products in Canada—including Privacy-Assured's

distribution rights—as part of the work AD Corp was obligated to perform under the Shared

Services Agreement.

AD Group's Associate General Counsel testified that he signed the Privacy-Assured Distribution Agreement on behalf of AD Corp under authority of the Shared Services Agreement. *Fountain Dep.* at 33-34 (annexed as Exhibit 3).  Likewise, AD Group's Rule 30(b)(6) witness testified that AD Corp entered into the Privacy-Assured Distributor Agreement pursuant to authority conferred in the Shared Services Agreement.  *Cook Dep.* Vol. 1 at 37 (annexed as Exhibit 4).   In answers to written discovery in this case, AD Group admitted that it provided services to AD Corp in Canada under the Shared Services Agreement; these included sales fulfillment and "distribution and provision of product and software licenses"  under "each and every agreement of AD Corp with a third party."  Mr. Cook testified that at the time of AD Group's unwinding in 2015, "those [payments for the five percent premium owing under the Shared Services Agreement] should have been settled through a cash transfer, but I never saw that happen." *Cook Dep.* Vol II at 98-100, annexed as Exhibit 2.  And, as explained above, elsewhere in the Opposition, AD Group itself asserts that Privacy-Assured's Canadian distribution rights were, in fact, covered by the Shared Services Agreement.

In short, this argument should be rejected because it finds no support in the Shared Services Agreement and is belied by the parties' conduct, accounting records, and sworn testimony.

## II.     AD Group's Default of the Shared Services Agreement Was Not Excused by AD Corp.'s Refusal to Honor Its Distribution Agreement with Privacy-Assured.

AD Group argues that it should be excused from having failed to make the payments required by the Shared Services Agreement because AD Corp was in default.  The alleged default was that AD Corp failed to deliver software in accordance with the Privacy-Assured Distributor Agreement.   In other words, AD Group argues that by refusing to provide AD Group

products to Privacy-Assured for distribution in Canada, AD Corp failed to provide sales support for AD Group's products. *Opposition* at 13.

The most obvious flaw in this argument is that, as shown above, the decision to withhold products from Privacy-Assured was not made by AD Corp, but by AD Group, which manufactured and owned the software products.   In the Shared Services Agreement, AD Group reserved to itself the "provision of product and software licenses."   Under that agreement, AD Group had exclusive authority to service "each and every agreement of [AD Corp] with a third party."   Thus, AD Group controlled the event that triggered AD Corp's default of the Distributor Agreement.   AD Group should not be able to complain about a "default" of the Shared Services Agreement that Ad Group itself caused.

Further, by failing to raise its default argument years ago, AD Group waived it as a matter of law.   Instead of complaining that AD Corp failed to deliver software to Privacy-Assured back in 2013, when the arbitration started, it instead continued to perform under the Shared Services Agreement until at least late 2015.   "[A] waiver is the intentional relinquishment of a known right." *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 16, 196 P.3d 588.

Finally on this score, the Rule 30(b)(6) testimony of AD Group's representative forecloses AD Group's default argument.   Rule 30(b)(6) provides that an entity named in the deposition notice must "designate one or more officers, directors, or managing agents ... to testify on its behalf."   The designated representative must "testify about information known or reasonably available to the organization."   The law is clear that any affidavit or testimony in conflict with the Rule 30(b)(6) deposition may not be made without good reason. *See Keepers,*

*Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will ... try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery."); *MKB Constructors v. Am. Zurich Ins. Co.*, 49 F.Supp.3d 814, 829 (W.D. Wash. 2014) ("[A] party cannot rebut the testimony of its Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and there is no adequate explanation for the rebuttal.").  As shown in detail in the factual presentation above, AD Group's Rule 30(b)(6) designee testified repeatedly that the AD Corp did not breach the Shared Services Agreement and was entitled to payment.

III.    **AD Corp. Is Entitled to Payment from AD Group Under the Shared Services Agreement.**

AD Group's third argument is that, according to Mr. Leehealey's deposition testimony, AD Corp was not entitled to any payment from AD Group under the Shared Services Agreement. As shown in the factual presentation above, however, Mr. Leehealey's testimony on this subject is entitled to no weight whatsoever.  Elsewhere in his deposition, Mr. Leehealey disclaimed having any memory of the Shared Services Agreement or the parties' right thereunder.  Further, AD Group is bound by the testimony of Mr. Cook that payment was due and owing and should have been made to AD Corp.

Privacy-Assured is entitled to summary judgment on its breach of contract claim because there is no genuine dispute about the enforceability of the Shared Services Agreement.  When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling. If the language within the four corners of the contract is unambiguous ... a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law. *Fairbourn Commercial, Inc. v. American Housing Partners, Inc.*, 2004 UT 54, ¶ 10, 94 P.3d 292.  Based on the testimony of its own representative,

AD Group unquestionably breached the Shared Services Agreement.   It is undisputed that the Shared Services Agreement constituted a valid and enforceable contract.  It is also undisputed that AD Corp performed all its obligations under the agreement.  AD Group's Rule 30(b)(6) witness admitted that AD Group failed to pay AD Corp the premium of five percent of its expenses from at least September 2011 until August 2015. It is further undisputed that the Amended Judgment against AD Corp was entered during the term of the Shared Services Agreement and, therefore, was an expense covered by the Shared Services Agreement.

AD Group's breaches of the Shared Services Agreement damaged AD Corp, and therefore Privacy-Assured as successor to AD Corp's interest under the agreement, in an amount to be proven at trial.  As a matter of law, Privacy-Assured's damages consist of the total of all of AD Corp's unreimbursed expenses, including the full amount of the Amended Judgment, plus the five percent premium thereon.

## IV.   AD Group's Decision to Terminate the Shared Services Agreement in August 2015 Did Not Resolve AD Group's Obligations To AD Corp Under That Agreement.

Finally, AD Group argues that at the time of the execution sale, there was no collateral because all inter-company obligations under the Shared Services Agreement had already been "resolved."  AD Group fails to substantiate the resolution of the obligations with any evidence— evidence like a settlement agreement or cashed check.  As shown in the factual presentation in Privacy-Assured's opening memorandum, AD Group's Rule 30(b)(6) designee testified repeatedly that the AD Corp had not breached the Shared Services Agreement and was entitled to payment of the five percent premium. He testified that as of the winding up of AD Corp's affairs, there was still a receivable, including this Court's judgment resulting from the Privacy-Assured arbitration, on AD Corp's books, and there was a corresponding payable on AD Group's books. A party's termination of a contract does not cancel matured obligations under the

contract. *Ford v. Am. Exp. Fin. Advisors, Inc.*, 2004 UT 70, ¶ 20, 98 P.3d 15, 22. Despite AD Group's attempt to reduce that payable to zero by "resolution" or through a sloppy accounting trick, its payment obligation is not resolved until payment is made.

Further, the cause of action for breach is precisely the type of chose in action which may be sold in an execution sale. The definition of property subject to execution is extremely broad, encompassing "the defendant's property of any type not exempt from seizure," including "real and personal property, tangible and intangible property, the right to property whether due or to become due, and an obligation of a third person to perform for the defendant." Utah R. Civ. P. 64(a)(9). Choses in action have been identified as a type of intangible property included the rule's list of permitted sales. *See Bagford v. Ephraim City*, 904 P.2d 1095, 1098 (Utah 1995) ("[I]ntangible property, such as choses in action, patent rights, franchises, charters or any other form of contract, are within the scope of [eminent domain] ... as fully as land or other tangible property.").

In light of the current broad definition of property subject to execution, it is inconceivable that AD Corp's chose in action would not be subject to execution. Privacy-Assured, as a judgment creditor of AD Corp, properly executed against AD Corp's right, title, and interest in the AD Corp Collateral (as that term is defined in the Motion). *See* Ex. 7 to Motion, Certificate of Sale. As the owner of AD Corp's claims against AD Group, Privacy-Assured brought the present breach of contract action against AD Group for breach of the Shared Services Agreement. Since it is the only party with standing to sue based on that agreement, it possesses the right to collect damages resulting from AD Group's breach.

## CONCLUSION

Privacy-Assured asks the Court to grant the motion on its breach of contract claim and award the foregoing categories of damages in an amount to be proven at trial.

4820-2504-1319.1

DATED this 23rd day of September, 2019.

**SNELL & WILMER L.L.P.**

 /s/ Timothy J. Dance
Timothy J. Dance
Alan Sullivan, *of counsel*
*Attorneys for Plaintiff Privacy-Assured Inc.*

16

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of September, 2019, a true and correct copy of the

foregoing PLAINTIFF'S REPLY TO DEFENDANT ACCESSDATA GROUP, INC.'S

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT was served via

CM/ECF to the following:

**Randall L Skeen**
COOK SKEEN & ROBINSON
5788 S 900 E
SALT LAKE CITY, UT 84121-2178
(801)266-7414
Email: rskeen@skeenandrobinson.com

**Shawn H. Robinson**
COOK SKEEN & ROBINSON
5788 S 900 E
SALT LAKE CITY, UT 84121-2178
(801)266-7414
Email: srobinsonlaw@hotmail.com

**Jordan K. Cameron**
DURHAM JONES PINEGAR PC
3301 N THANKSGIVING WY STE 400
LEHI, UT 84043
(801) 375-6600
Email: jcameron@djplaw.com

**Peter H. Donaldson**
DURHAM JONES & PINEGAR
111 S MAIN ST STE 2400
PO BOX 4050
SALT LAKE CITY, UT 84110-4050
(801)415-3000
Email: pdonaldson@djplaw.com

/s/ Timothy J. Dance

4820-2504-1319.1